**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

| | | |
|---|---|---|
| **RODNEY A. HURDSMAN** | § | |
| | § | |
| | § | |
| | § | |
| **v.** | § | **A-17-CV-290-RP** |
| | § | |
| | § | |
| **COMMANDER POKLUDA, et. al.** | § | |
| | § | |

## ORDER

Before the Court are Plaintiff Rodney A. Hurdsman's complaint (ECF No. 1) and the Motion for Summary Judgment (ECF No. 77) filed by Defendants Pokluda, Gleason, Williams, Brumleve, Casey, Mobley, Barcenas, Herrera, Villareal, Voisine, Wheless, Barnett, Harris, Nira, Davis, and Williamson County, Texas.[1] Defendants have also filed a Motion to Strike Plaintiff's Experts. (ECF No. 78.) Hurdsman has responded to Defendants' Motion for Summary Judgment and filed a Motion pursuant to Fed. R. Civ. P. 56(d). (ECF Nos. 84, 86.) Hurdsman is proceeding pro se and has paid the full filing fee for his lawsuit. Upon careful consideration of the parties' motions, the Court grants in part and denies in part Defendants' Motion for Summary Judgment, grants Defendants' Motion to Strike, and denies Hurdsman's Motion pursuant to Rule 56(d).

## STATEMENT OF THE CASE

At the time he filed his complaint, Hurdsman was confined in the Williamson County Jail (WCJ) as a pretrial detainee. He is currently incarcerated in the Robertson Unit of the Texas

---

[1]Three defendants' names are misspelled in Hurdsman's complaint and are corrected as follows: Kathleen Pokluda; Michael Brumleve, and Bruce Voisine. (ECF No. 77 n.1.)

Department of Criminal Justice-Correctional Institutions Division. He has filed this complaint pursuant to 42 U.S.C. §1983.

Hurdsman alleges that, during his detention in the WCJ, his legal mail was intentionally mishandled, resulting in the dismissal of a civil action he was litigating in Wise County, Texas, and that, after he filed several grievances over the mishandling of his legal mail, Defendants retaliated against him by placing him in disciplinary segregation. After spending several months in segregation, Defendants then used excessive force against him by tasing him several times and putting him in an Emergency Restraint Chair (ERC) and then further retaliated against him by taking away his mattress, Bible, rosary, and all his correspondence materials for thirty days. As a result, he was made to sleep on a 3/16" steel plate for thirty days, which caused sores to develop on his body. Hurdsman sues Williamson County and the following employees of the Williamson County Sheriff's Office (WCSO): Commander Kathleen Pokluda, Chief Mike Gleason, Lieutenant Jeffrey Williams, Sergeant Michael Brumleve, Sergeant Brian Casey, Sergeant Jimmy Mobley, Officer Mario Barcenas, Officer Aric Herrera, Officer Julian Villareal, Officer Bruce Voisine, Lieutenant Doug Wheless, Sergeant Ronald Barnett, Sergeant Shamona Harris, Sergeant Adrian Nira, and Officer Jeremy Davis. He requests compensatory damages in the amount of $400,000.00, punitive damages in the amount of $500,000.00, declaratory relief, injunctive relief, and court costs. (ECF No. 1.)

After Defendants filed a Partial Motion for Dismissal (ECF No. 24), the Court dismissed one defendant and several of Hurdsman's claims (ECF No. 27). The parties thereafter engaged in lengthy discovery. Defendants now file their motion for summary judgment, arguing there are no genuine issues of material fact; that all of Hurdsman's claims fail; that the individual Defendants

are entitled to qualified immunity; and that there is no evidence supporting municipal liability against Williamson County. (ECF No. 77.)

Hurdsman responds to Defendants' motion by restating his allegations, rebutting Defendants' claims, and providing additional evidence. (ECF No. 81.) Hurdsman has also filed a motion pursuant to Fed. R. Civ. P. 56(d), arguing that Defendants have failed to produce several videos that Hurdsman believes would further substantiate his claims, and requests a list of people near his cell when the alleged excessive force incident occurred as well as a list of inmates either tased or put in an ERC at the WCJ between April 2015 and July 2017. (ECF No. 86.) Defendants oppose the motion, arguing there has been ample opportunity for discovery. (ECF No. 88.)

## DISCUSSION AND ANALYSIS

### A. Factual Background

*Mishandled Legal Mail*

Hurdsman was booked as a pretrial detainee at the WCJ on April 28, 2015. (ECF No. 76 (ex. 1).) Two weeks later, Hurdsman began submitting grievances regarding his access to WCJ's law library. (ECF Nos. 76 (ex. 4), 81 (ex. 3).) He also formally complained when his legal mail— which he requested to be sent via indigent mail—was returned to him when he had sufficient funds to pay for postage. (ECF No. 81 (ex. 5).)

On February 9, 2016, Hurdsman requested to mail a legal document to the Wise County Clerk via indigent mail. However, the following day, he was denied indigent postage supplies, and the mail was returned to him with the response, "Per Chief you can purchase the stamps off of commissary." Hurdsman states he immediately resubmitted the package for mailing, stating it was a time sensitive matter. The complaint form appears to have been sent twice, with two separate

dates on it. On it, Hurdsman states his understanding that, when his funds became available, the $4.00 postage would be taken from either his inmate trust account or from his weekly packs of indigent legal mail. (ECF No. 81 (ex. 6).) Hurdsman avers that he never heard back from the mailroom and assumed the package had been sent. (ECF No. 81 at 4.) On February 18, Officer Freeburg responded to Hurdsman's mail complaint, stating "Chief Gleason, himself, took your mail package to the mail room where it was processed w/ postage for the Georgetown Post Office." (ECF No. 76 (ex. 10).)

On March 16, 2016, Hurdsman filed a grievance, stating the issues with his February 9 legal mail and his assumption that it had been mailed out, but that he had heard nothing from the Wise County Court, and there was no entry in his mail log for that day. (ECF Nos. 76 (exs. 9, 58).) Hurdsman has submitted a page of handwritten notes—purportedly written by Deputy Giles and detailing telephone contacts with the Wise County District Clerk—which show that, as of March 30, 2016, there had been "nothing received" and that "Hurdsman called last Friday." (ECF No. 81 (ex. 7).)[2]

On April 12, 2016, Hurdsman submitted grievances to Defendants Gleason and Pokluda, along with two other WCSO captains, stating that his legal mail had been mishandled by Defendant Gleason, and that while he had been assured the document would be resent, it had not been. (ECF No. 81 (ex. 8).) On April 19, Hurdsman requested a formal grievance form from Captain Freeburg so he could address the "theft" of his mail. (*Id.* (ex. 9).) Hurdsman sent another complaint to Freeburg that same day, stating that none of his complaints had received responses, and asking for copies of his prior complaints or a "formal" grievance form. (*Id.*) Hurdsman submitted another

---

[2] On February 27, 2017, the Wise County District Clerk filed a letter received from WCSO Commander Brian Lloyd stating that Hurdsman's legal mail had been given to Defendant Gleason for processing, and that the WCJ attempted to send a second copy when it became clear the first one did not arrive. (ECF No. 81 (ex. 10).)

complaint on April 21, restating his issues and threatening a federal lawsuit. (*Id.*) He then filed two formal grievances on April 22 and May 1, noting in the latter that he had yet to receive any response to his complaints, and threatening to contact Sheriff Wilson about the matter. (*Id.*)

Hurdsman attested that Defendants Williams and Voisine approached him at different times and warned him to stop filing grievances about his missing legal mail "or there's going to be consequences." Hurdsman attested that he thought Defendants Gleason and Pokluda sent Williams and Voisine to threaten him. (ECF No. 76 (ex. 3) (Hurdsman's Dep. 69:9-72:10)) (*hereinafter* Hurdsman's Dep.).

*Hurdsman moves to disciplinary segregation*

On May 18, 2016, Hurdsman again filed a complaint about the lack of response to his complaints and grievances, arguing that the Jail Standards Administrative Code required the WCJ to answer complaints within sixty days. Deputy Giles received the complaint at 11:21 a.m. and responded "Per Capt. Pokluda—you should be getting a written response from Lt. Williams on 5-19-16." (ECF No. 81 (ex. 12).)

Approximately three hours later, at 2:10pm, Defendant Mobley went to Hurdsman's cell. The parties' version of what happened next differ. Defendants state that Mobley informed Hurdsman he was being moved to the same type of cell but in a different location. Hurdsman refused to move, stating "I am not moving there with all those kids. I get no sleep over there." (ECF No. 76 (ex. 17).) When Mobley insisted he move, Hurdsman began shouting obscenities at Mobley, who then contacted Classification. Classification directed Mobley to move Hurdsman to B9R-6, a disciplinary segregation cell, which—unlike Hurdsman's current cell that had bar doors—has a solid door with only a window and a food portal. (*Id.* (ex. 18).) Defendants submitted a classification document wherein a WCJ staff person writes that Hurdsman requested to be moved

5

"behind the door" (i.e. to disciplinary segregation.) (*Id.* (ex. 16).) Mobley handcuffed Hurdsman and moved him to his new cell; Hurdsman refused to stay, saying there was feces in the toilet. Mobley cleaned the toilet and then transported all of Hurdsman's property to his cell. (*Id.* (ex. 17).)

Hurdsman's account of the move is quite different. He avers that Mobley came to his cell and told him "pack your stuff you['re] moving to disciplinary segregation." Mobley also said that if Hurdsman "had just listened to Williams and Voisine [he] would not be having any of these difficulties." (ECF No. 81 at 7.) Hurdsman denies asking Mobley to put him "behind the door" and states that not only was the toilet clogged in his new cell, but there was feces all over the floor and walls from a previous inmate. Hurdsman alleges that Mobley left him there, without cleaning the toilet or floors or walls, and further notes that while WCSO staff were, at this time, required to videotape all interactions with him (*id.* (ex. 15)), Mobley failed to videotape this encounter.

Afterward, Hurdsman was disciplined for "Disruption of Jail Activity" and "Refusal to Follow Written or Oral Directive" and sanctioned with fifteen days in disciplinary segregation along with loss of privileges. (ECF No. 76 (ex. 19).) Hurdsman's sanctions ended on June 2, 2016 (*id.*); however, Hurdsman remained in this disciplinary segregation cell until October 21, 2016 (*id.* (ex. 2)).

At the end of May 2016, Hurdsman was taken to a hallway where Deputy Watts and Defendants Gleason, Pokluda, and Williams were waiting. They asked Hurdsman why he continued to purse the legal mail issue and told him to "leave it alone . . . or else." (Hurdsman's Dep. 72:16-25).) Hurdsman further alleged that Defendant Gleason told him he would "find out the hard way" that Gleason, not Hurdsman, runs the jail. (ECF No. 81 at 9.)

*The September 21 Incident*

By September 21, 2016, Hurdsman had been housed in disciplinary segregation for 126

days. Hurdsman began complaining to WCSO officers about how he was being housed in an isolation cell in retaliation for pursuing grievances against Defendant Gleason for the mishandling of his legal mail. (ECF Nos. 81 at 10; Hurdsman's Dep. 94:1-96:25.) At 2 a.m. on September 21, Hurdsman alleges that Officer Aaron Grant rounded by his cell, and Hurdsman asked Grant to move him, complaining that the inmate in the cell next to him had been banging on the metal walls for three days, and that either the inmate needed to be moved or Hurdsman did. (ECF No. 81 at 10.) Grant reported that Hurdsman got his attention by striking his cell door and yelling, and that, after he complained to Grant about the neighboring inmate, Hurdsman began striking the wall and slamming his stool. (ECF No. 76 (ex. 20).) Hurdsman denies banging on the wall or slamming his stool, and alleges he requested a supervisor be called so he could be moved; Grant reported calling Defendant Brumleve. (*Id.*; ECF No. 81 at 10-11.)

Defendants submitted video of their encounter with Hurdsman. (ECF No. 76 (ex. 24).) It begins with Defendants Brumleve, Herrera, Barcenas, Villareal, and Davis at Hurdsman's cell door at 2:58 a.m. on September 21.[3] Hurdsman has his arm hanging out of the food portal, and when Brumleve says Hurdsman has been banging on his cell door, Hurdsman argues that it is not him but the inmate next door who has been banging for two days. Defendants Brumleve and Herrera tell Hurdsman three times to put his arm back in his cell or he will be tased; Hurdsman does not comply and Herrera delivers a "drive stun" to Hurdsman's right shoulder to gain compliance.[4] Hurdsman then begins swatting at both the taser and the defendants, at which point Brumleve orders the door opened. Hurdsman takes his arm out of the food portal, steps back into

---

[3] Hurdsman alleges that Defendants Brumleve, Herrera, Barcenas, and Villareal were all part of "The Goon Squad," i.e. a group of WCSO officers who would come up from booking to disciplinary segregation in order to tase inmates and put them in Emergency Restraint Chairs (ECF No. 81 at 10-11.)

[4] Hurdsman alleges that this drive stun caused him to hit his mouth on the food portal and chip two of his front teeth. (ECF No. 81 at 11.) At that moment, the camera is not on Hurdsman, so the video neither supports nor contradicts this allegation. (ECF No. 76 (ex. 24).)

his cell to grab his mattress, and pushes his mattress against the door. The defendants enter the cell by pushing against Hurdsman, who is using his mattress to shield himself from being tased. Defendant Herrera pushes Hurdsman back and deploys the taser gun, whereupon Hurdsman falls to the ground. Herrera and two other officers roll Hurdsman onto his stomach, yelling at Hurdsman to give them his hands. With one defendant on the left side of Hurdsman's back and another on his legs, Brumleve orders another defendant to enter the cell to assist. On his stomach and with two men on his back, Hurdsman does not comply with the orders, and upon Brumleve's orders, Herrera delivers another taser cycle. (*Id.*)

Defendants eventually handcuff Hurdsman's arms behind him, and he complains loudly that his shoulder is broken. Hurdsman rolls onto his left side, complaining about shoulder pain. He begins arguing with Defendants about what happened, and eventually moves to sit up. Hurdsman attempts to pull the taser prongs out while sitting up; Brumleve tells him to stop resisting, and then orders the officers to "stand him up and put him in the chair." Hurdsman again complains that his "shoulder's out of the f---ing socket" and asks for a minute before Defendants stand him up. He threatens to hurt the defendants and says "when I bite you, or hurt your, it's on you." He tells one of the defendants to get away from him as he slowly spins around and scoots away from the officer in question; then, as he's lying backward, he lifts his leg and moves it around the officer, at which time Herrera discharges another taser cycle and deploys a drive stun to Hurdsman's right abdomen. (*Id.*)

Defendant Barnett then arrives to evaluate Hurdsman's right shoulder and to remove the taser prongs. Hurdsman attempts to remove the prongs himself, using his right arm, and yells at Defendants "the taser ain't working okay!" Barnett examines Hurdsman's right shoulder and says that he cannot see or feel any deformities. At this point, Defendants lift Hurdsman to his feet and

begin walking him to the Emergency Restraint Chair (ERC); Hurdsman continues to push at and threaten Defendants. Hurdsman resists being retrained in the ERC, complains about shoulder pain, and makes several threats. Barnett examines Hurdsman and tells the other officers that one of the restraints needs to be loosened. Hurdsman is eventually transported to a detox cell. Defendant Brumleve thereafter reports that Hurdsman's cell smelled strongly of alcohol and that, after they searched Hurdsman's cell, they found a cereal bag that appeared to have alcohol in it. Brumleve states that Hurdsman was likely intoxicated on "jailhouse hooch," which explained his erratic behavior. (*Id.*)

Hurdsman remained in the ERC from 3:15 a.m. until 8:04 a.m., and was checked on by WCJ staff, including Defendant Nira, approximately every 15 minutes. (ECF No. 76 (ex. 27).) At one point, Defendants needed to move Hurdsman to a different ERC, as his was defective: a leg strap was broken and Defendants alleged Hurdsman was attempting to flip the chair. During this transition, Hurdsman was very aggressive towards Defendants—he threatened them with foul language and resisted all attempts to move his body. (ECF No. 76 (ex. 24).) Hurdsman alleges that he was in substantial pain but that Defendants ignored his requests for medical treatment. (ECF No. 81 at 13.)

The next afternoon, Hurdsman took a shower and was escorted back to his cell. A medical officer asks Hurdsman if he wants an x-ray of his shoulder or to see the doctor, and Hurdsman refuses, saying that his shoulder no longer hurts. (ECF No. 76 (exs. 24, 29).) Defendant Mobley tells Hurdsman "here's what Captain wants right now": Hurdsman he can keep his legal materials, a bar of soap, and have a suicide smock and suicide blanket.[5] When they get to Hurdsman's cell,

_____

[5] According to WCJ's jailing notes, Defendant Pokluda placed Hurdsman on "suicide watch" on August 2, 2016. (ECF No. 81 (ex. 15 at 2).) Hurdsman attested that he was not suicidal but that being put on suicide watch was something WCSO staff did to all inmates who "act[ed] up." (Hurdsman's Dep. 197:15-22.)

Mobley and another officer begin emptying it. They tell Hurdsman that his correspondence and hygiene products will "stay here" and he can use them in his dayroom time or when he showers. All other items were taken to property, including Hurdsman's mattress and blanket. The video suggests that, outside of his correspondence and hygiene products, no other property was available to Hurdsman. (ECF No. 76 (ex. 24).) Hurdsman alleges, and Defendants do not deny, that this policy was made at the direction of Defendants Pokluda, Gleason, Wheless, Williams, and Casey. (ECF No. 81 at 13.)

*Loss of Privileges, September 21-October 20*

Hurdsman received a Notice of Disciplinary Hearing on September 21, which charged him with three violations: Threatening, Possession of Contraband (Major), and Recklessness. (ECF No. 76 (ex. 30).) All three violations are considered major infractions and, under WCSO Policy, approved sanctions for major infractions include "loss of any or all Privileges for a period not to exceed thirty days," and disciplinary separation for a period not to exceed thirty days. (*Id.* (ex. 15 at 9).) However, certain sanctions are not permitted, including: (1) corporal punishment, (2) deprivation of clothing or bedding ("Only inmates who destroy clothing or bedding may be deprived of such items for up to 24 hours. This shall be reviewed and documented every twenty-four (24) hours"); and (3) "deprivation of correspondence privileges when the offense is unrelated to a violation of the institutional rules and regulations regarding correspondence." (*Id.* at 9-10.)

It is undisputed that, from September 21 to October 21, Hurdsman was required to sleep on a 3/16" steel plate without a mattress and with only a suicide smock and blanket. (ECF No. 81 at 14.) Hurdsman had previously seen a WCJ doctor for his plaque psoriasis in February 2016. (*Id.* (ex. 31).) As a result of his sleeping without a mattress, Hurdsman developed sores on his hips and outer thighs, and attested that were painful and occasionally bled. (Hurdsman Dep. 194: 12-24.) A

video made on October 4, 2016, shows Hurdsman complaining about the sores, and showing them to the medical officer thru his food portal. (ECF No. 76 (ex. 57).) Hurdsman saw a doctor the next day, who noted that Hurdsman had no mattress and diagnosed him with two erythemas[6] on both hips. The doctor told Hurdsman that the sores were "not good" (ECF No. 81 at 15), and wrote that the erythemas "blanch" and were not "decubitus ulcer[s] at this point."[7] The doctor prescribed a zinc oxide barrier cream and also wrote "soft surface would be ideal." (ECF No. 76 (ex. 62).) Hurdsman alleges that Defendant Wheless was in the room during this examination and told Hurdsman "you brought it on yourself." (ECF No. 81 at 15.)

Hurdsman submitted a grievance about the sores and his lack of a mattress on October 12, and then filed another grievance (albeit on a Medical Request Form) on October 18, addressed to the Medical Supervisor and Defendant Wheless. (*Id.* (ex. 36).)

Hurdsman asserts that, on orders from Defendants Gleason and Pokluda, Defendant Mobley removed all writing instruments, paper, envelopes, and postage stamps from Hurdsman's cell. Defendants do not deny this; rather, they argue that it was part of Hurdsman's loss of privilege status stemming from the September 21 incident. Between September 21 and October 21, Hurdsman had two visits (from his attorneys and his parents), sent five letters via in-house mail to his wife, Stephanie Hurdsman, and sent three legal packages—two to a federal district court, and one to Williamson County. (*Id.* (ex. 4).) A video from September 28 shows Hurdsman using the telephone in the dayroom. (ECF No. 76 (ex. 39).)

Hurdsman alleges, and Defendants do not deny, that Defendants Pokluda, Williams, Mobley, and Casey ordered all other WCJ and WCSO personnel not to allow Hurdsman to have

---

[6] An erythema is "redness due to capillary dilation, usually signaling a pathologic condition (e.g. inflammation, infection.)" STEDMAN'S MEDICAL DICTIONARY 302460 (27th ed. 2000).
[7] A decubitus ulcer is synonymous with a bedsore. STEDMAN'S MEDICAL DICTIONARY 98550 (27th ed. 2000)

or purchase any items from the jail's commissary, which included writing instruments, paper, envelopes, and postage stamps. He further states that, because of this restriction, he was forced to barter his food trays in order to obtain the necessary correspondence materials. (ECF No. 81 at 16.)

On orders from Defendants Pokluda, Gleason, Williams, and Casey, Defendant Mobley removed Hurdsman's Bible, rosary, and a religious book from his cell on September 21 and did not return it for 30 days. (*Id.*) A video from Hurdsman's dayroom time on September 23 shows Hurdsman walking with a small dictionary from his cell when he asks to trade that dictionary for another one; the officer asks him if he wants his dictionary or Bible, and Hurdsman tells him to "bring the whole box." (ECF No. 76 (ex. 33).) A few minutes later, another officer hands Hurdsman a plastic bin and tells him "it should have all your stuff in there, Bible and all that stuff." (*Id.* (ex. 34).) WCSO policy permits inmates to have in their possession at any time two soft-covered religious books, three religious study guides, and one religious item. (*Id.* (ex. 15 at 15).) Defendants submitted photographs of Hurdsman's plastic bin taken on October 10, 2016: one photo shows the bin with only his hygiene products, and the other shows the bin with only a Bible and the book *The Prodigal God*. (*Id.* (ex. 57).) Defendants argue that Hurdsman was allowed these items during his dayroom time (*Id.* (ex. A at 32-33).) Hurdsman argues these pictures are deceiving: the plastic bin only ever contained a plastic bag of hygiene products, a shower towel, a change of clothes, and the mail he had received; he states that he did not have access to his Bible, rosary, or religious book for thirty days. (ECF No. 81 at 16-17.)

Hurdsman's parents visited him at WCJ on October 16, 2016. (ECF No. 81 (ex. 4 at 55).) Afterwards, Hurdsman's mother filed a complaint with the Texas Commission on Jail Standards (TCJS) about his conditions of confinement. (ECF No. 76 (ex. 3 at 17).) In a response dated

November 4, 2016, a TCJS program specialist states that he had reviewed Hurdsman's jail conditions of confinement along with video footage of the September 21 incident and "found no violations of Minimum Jail Standards." (ECF No. 76 (ex. 68).) On October 20, Hurdsman complains on video that he hasn't had a mattress for thirty days and he cannot buy stamps and envelopes from the commissary. (ECF No. 81 (ex. 29).)

On October 21, 2016, Hurdsman had a disciplinary hearing based off the September 21 incident and was found guilty of threatening, and sanctioned with disciplinary segregation, loss of television, telephone, commissary, and visitation privileges, and removal from programs from September 21 to October 20, 2016. (*Id.* (exs. 22, 52).

B. Legal Standards

*1. Summary Judgment*

A court will, on a motion for summary judgment, render judgment if the evidence shows that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. *See Eason v. Thaler*, 73 F.3d 1322, 1325 (5th Cir. 1996); *Int'l Shortstop, Inc. v. Rally's Inc.*, 939 F.2d 1257, 1263 (5th Cir. 1991). When a motion for summary judgment is made and supported, an adverse party may not rest upon mere allegations or denials but must set forth specific facts showing there is a genuine issue for trial. *Ray v. Tandem Computers, Inc.*, 63 F.3d 429, 433 (5th Cir. 1995); FED. R. CIV. P. 56.

Both movants and non-movants bear burdens of proof in the summary judgment process. *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986). The movant with the burden of proof at trial must establish every essential element of its claim or affirmative defense. *Id.* at 322. The moving party without the burden of proof need only point to the absence of evidence on an essential element of

the non-movant's claims or affirmative defenses. *Id.* at 323-24. At that point, the burden shifts to the non-moving party to "go beyond the pleadings and by [his] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 324. The non-moving party cannot rely on general allegations but must produce "specific facts" showing a genuine issue for trial. *Tubacex v. M/V Risan*, 45 F.3d 951, 954 (5th Cir. 1995).

In deciding whether to grant summary judgment, the Court should view the evidence in the light most favorable to the party opposing summary judgment and indulge all reasonable inferences in favor of that party. *See James v. Sadler*, 909 F.2d 834, 837 (5th Cir. 1990). The Fifth Circuit has concluded "[t]he standard of review is not merely whether there is a sufficient factual dispute to permit the case to go forward, but whether a rational trier of fact could find for the non-moving party based upon the evidence before the court." *See id.* (citing *Matsushita Electric Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)).

### 2. Qualified Immunity

"A qualified immunity defense alters the usual summary judgment burden of proof." *Brown v. Callahan*, 623 F.3d 249, 253 (5th Cir. 2010). A government official performing a discretionary function is shielded from liability for civil damages so long as his actions do not violate a clearly established right of which a reasonable person would have known. *See Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). "Once an official pleads the defense, the burden then shifts to the plaintiff, who must rebut the defense by establishing a genuine fact issue as to whether the official's allegedly wrongful conduct violated clearly established law." *Brown*, 623 F.3d at 253. The plaintiff must therefore present evidence sufficient to create a genuine dispute of material fact

as to whether (1) the official's conduct violated a constitutional right of the plaintiff, and (2) the constitutional right was clearly established so that a reasonable official in the defendant's situation would have understood that his conduct violated that right. *See id.*; *Pearson v. Callahan*, 555 U.S. 223, 232 (2009). For the right to be clearly established, the plaintiff must show that defendants had "'fair warning' that their specific actions were unconstitutional." *Taylor v. Stevens*, --- F.3d ---, No. 17-10253, 2019 WL 6975029 (5th Cir. Dec. 20, 2019); *see also Ashcroft v. al-Kidd*, 563 U.S. 731, 741-42 (2011) (relevant right is not defined at high level of generality; rather, "existing precedent must have placed the statutory or constitutional question beyond debate"). In considering a qualified immunity defense, the Court must still view the evidence in the light most favorable to the non-movant and draw all inferences in the non-movant's favor, *see Rosado v. Deters*, 5 F.3d 119, 122-23 (5th Cir. 1993), and cannot make credibility determinations or weigh the evidence, *see Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000).

C. Analysis

*1. Retaliation*

"Under the First Amendment, a prison official may not harass or retaliate against an inmate 'for exercising the right of access to the courts, or for complaining to a supervisor about a guard's misconduct.'" *DeMarco v. Davis*, 914 F.3d 383, 388 (5th Cir. 2019). The elements of a retaliation claim are "(1) a specific constitutional right; (2) the defendant's intent to retaliate against the prisoner for his or her exercise of that right; (3) a retaliatory adverse act; and (4) causation." *Jones v. Greninger*, 188 F.3d 322, 324-25 (5th Cir. 1999). The plaintiff must establish that "but for the retaliatory motive the complained of incident . . . would not have occurred." *Woods v. Smith*, 60 F.3d 1161, 1166 (5th Cir. 1995). Mere conclusory statements that retaliation occurred are not

sufficient; rather, "the inmate must produce direct evidence of motivation or, . . . 'allege a chronology of events from which retaliation may plausibly be inferred.'" *Id.*

The substance of Hurdsman's retaliation claim comes to this: after Defendant Gleason misplaced his legal mail, and Hurdsman began filing grievances, Defendants Voisine and Williams warned Hurdsman to stop complaining about his missing legal mail or "there would be consequences."[8] Hurdsman nevertheless continued to file his complaints and grievances, the last of which was received by Officer Giles on May 18 at 11:21 a.m.; Giles responded "Per Capt. Pokluda—you should be getting a written response from Lt. Williams on 5-19-16." Less than three hours later, Defendant Mobley moved Hurdsman to a disciplinary segregation cell. According to Hurdsman, Mobley told him "pack your stuff you['re] moving to disciplinary segregation" and further stated that if Hurdsman "had just listened to Williams and Voisine you would not be having any of these difficulties." Defendant Mobley's report of this account states that he was going to move Hurdsman to another bar-door cell, but that after Hurdsman became angry and refused to move, Classification told Mobley to move Hurdsman to a disciplinary segregation cell. Both parties agree there was feces in Hurdsman's new cell, but dispute how much there was, and who cleaned it up. Hurdsman was officially sanctioned with fifteen days in disciplinary segregation and loss of privileges; although this discipline was to end on June 2, Hurdsman remained in his disciplinary-segregation cell until October 21.

Hurdsman further alleges, and Defendants do not deny, that Defendants Gleason, Pokluda, and Williams confronted him in late May 2016, told him to stop pursuing the missing legal mail

---

[8] Hurdsman's complaint and declaration in response to Defendants' summary judgment motion were certified pursuant to 28 U.S.C. § 1746, and thus constitute competent summary judgment evidence. *See Taylor*, 2019 WL 6975029, at *5 (verified pleadings are competent evidence at summary judgment); *see also Lodge Music Hall, Inc. v. Waco Wrangler Club, Inc.*, 831 F.2d 77, 80 (5th Cir. 1987) (verified pleadings are competent summary judgment evidence when they are based on personal knowledge, set forth facts that would otherwise be admissible, and show affiant is competent to testify).

issue (i.e. "leave it alone . . . or else") and warned Hurdsman that he was going to "find out the hard way" that it was Gleason who ran the jail.

Hurdsman argues that Defendants continued to retaliate against him by keeping him in disciplinary segregation for 157 days, despite his disciplinary sanctions only supporting a total stay of forty-five days. Finally, Hurdsman argues that the September 21 incident was a way for Defendants to further retaliate against him by punishing him with tasers and putting him in the ERC, and afterward by putting him on "Suicide Watch" even though he was not suicidal, taking away his regular clothes and leaving him with a suicide smock, and taking away his mattress, Bible, rosary, and correspondence materials for thirty days. Defendants argue that Hurdsman was drunk and disruptive on September 21, failed to follow orders, and resisted their efforts to subdue him, thus warranting use of tasers and the ERC. They do not deny that Hurdsman was given only a suicide smock and blanket, and deprived of his mattress, Bible, rosary, and correspondence materials. Rather, they contend that this temporary property restriction was due to a legitimate penological interest, and as such, does not amount to a constitutional violation.

It is clearly established that a prison official "may not retaliate against or harass an inmate for complaining through proper channels about a guard's misconduct." *Morris v. Powell*, 449 F.3d 682, 684 (5th Cir. 2006). In this case, hours after Hurdsman filed a grievance about Defendant Gleason mishandling his legal mail, he was placed in disciplinary segregation, where he remained for over 157 days—well beyond the fifteen-day disciplinary sanction and the thirty-day sanction for the September 21 incident. Yet, the other sanctions Defendants imposed—deprivation of his mattress, Bible, rosary, and correspondence materials—are not permissible according to the WCSO handbook. Indeed, they are the kind of sanctions capable of deterring a person of ordinary firmness from further exercising his constitutional rights. *See id.* at 684-86; *Hart v. Hairston*, 343

F.3d 762 (5th Cir. 2003) (reversing grant of summary judgment when plaintiff claimed he was sanctioned with twenty-seven days of commissary and cell restrictions after filing a grievance).

Hurdsman includes Defendants Barnett, Harris, and Nira in his retaliation claim; however, the record does not show any evidence of them having committed an adverse action against Hurdsman. Rather, Barnett examined Hurdsman during the September 21 incident, and Nira checked on him while he was in the ERC. Accordingly, these defendants are granted summary judgment on the retaliation claim. *See Woods v. Smith*, 60 F.3d at 1166 (mere conclusory statements that retaliation occurred are not sufficient).

As to the other Defendants, there exist genuine issues of material fact regarding this retaliation claim: was Hurdsman put in segregation because he disrupted jail activity or because he filed grievances against Gleason? Did he remain there in excess of his 15 days as further retaliation? Were the sanctions he received after the September 21 incident further retaliation for Hurdsman's grievance activity?

In their motion for summary judgment, Defendants did not supply any affidavits attesting to their personal involvement in any of the events in this case. Rather, Defendants appear to argue that Hurdsman's claim fails as a matter of law. The Court disagrees. Defendants' motion to dismiss was already denied on this claim. And, based on the summary judgment record before the Court, there is a genuine issue of material fact on whether the deprivations and restrictions Hurdsman experienced—and which Defendants do not deny imposing—were in retaliation for his filing of prison grievances. Accordingly, summary judgment on the retaliation claim is denied as to Defendants Pokluda, Gleason, Williams, Brumleve, Casey, Mobley, Barcenas, Herrera, Villareal, Voisine, and Wheless. This claim will proceed to trial.

*2. Excessive Force*

The Fourteenth Amendment protects a pretrial detainee from "the use of excessive force that amounts to punishment." *Graham v. Connor*, 490 U.S. 386, 395 n.10 (1989). In this context, punishment can consist of actions that are: (a) "taken with an expressed intent to punish" or (b) "not rationally related to a legitimate nonpunitive governmental purpose" or "excessive in relation to that purpose." *Kingsley v. Hendrickson*, 135 S. Ct. 2466, 2473 (2015). To prove the use of excessive force, a pretrial detainee "must show only that the force purposely or knowingly used against him was objectively unreasonable." *Id.* Objective reasonableness turns on the facts and circumstances of a particular case and must be determined according to the perspective of a reasonable officer at the time of the use of force. *Id.* Relevant considerations include "the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting." *Id.*

Hurdsman alleges that Defendants Brumleve, Herrera, Villareal, Barcenas, and Davis used excessive force during the September 21 incident. The origins of the incident are disputed: Hurdsman alleges that he asked to see a supervisor due to the constant banging from his neighbor; Defendants report that it was Hurdsman who was banging the walls and slamming his stool. The video starts shortly before force is used, and Defendant Brumleve states that Hurdsman has been banging on his wall, which Hurdsman strongly denies.

During the course of the incident, Defendant Herrera tased Hurdsman four times. Defendant Brumleve ordered Herrera to tase Hurdsman once, when Hurdsman was face-down on his stomach with three officers on his back. The video also shows Hurdsman not following orders

and actively resisting at times. However, Hurdsman is tased while there are three officers on top of his body, and tased another time when he moved his leg. Because the defendants supplied no affidavits regarding their personal involvement, it is not clear from the record what efforts they made to limit or temper the force used, nor how they perceived the severity of the security problem Hurdsman posed. Further, Hurdsman alleges that he chipped two of his front teeth on the food portal after the initial drive stun, and complained of pain during the incident. A severe injury is not necessary to establish excessive force. *See Wilkins v. Gaddy*, 559 U.S. 34, 37 (2010) (the question is not whether a certain quantum of injury was sustained but whether the force was applied in a good faith effort to restore discipline or maliciously and sadistically to cause harm).

It is clearly established that pretrial detainees should be free from force that is not objectively reasonable. *See Kingsley*, 135 S. Ct. at 2473; *cf. Darden v. City of Fort Worth*, 880 F.3d 722 (5th Cir. 2018) (clearly established that when arrestee not actively resisting arrest, degree of force that can be employed is reduced; holding that if jury found plaintiff was not actively resisting arrest, jury could find that officer used excessive force by throwing plaintiff to the ground and tasering him twice) (citing *Bush v. Strain*, 513 F.3d 492, 501 (5th Cir. 2008)); *see also Newman v. Guendry*, 703 F.3d 757, 763-64 (5th Cir. 2012) (qualified immunity will not protect officers who apply excessive force merely because their means of apply it are novel; further, *Graham* excessive force factors "can 'clearly establish' the answer, even without a body of relevant case law").

Based on the summary judgment record, the Court concludes that there is a genuine issue of material fact whether the force used by Defendants Herrera and Brumleve was objectively reasonable. The Court grants summary judgment to Defendants Villareal, Barcenas, and Davis because the force they used—restraining Hurdsman's arms and legs—is not the basis for

Hurdsman's allegations of excessive force. Summary judgment is therefore denied as to Defendants Brumleve and Herrera; this claim will proceed to trial.

### 3. Deliberate Indifference

The Eighth Amendment ensures the safety of convicted prisoners while due process under the Fourteenth Amendment protects pretrial detainees. *See Hare v. City of Corinth*, 74 F.3d 633, 639 (5th Cir. 1996) (en banc). "Fourteenth Amendment case law concerning pretrial detainees [is based] on the Supreme Court's Eighth Amendment precedent concerning prisoners." *Garza v. City of Donna*, 922 F.3d 626, 634 (5th Cir. 2019) (*citing Hare*, 74 F.3d at 634-44). A pretrial detainee's Fourteenth Amendment rights include the right to medical care. *See Sanchez v. Young County., Tex.*, 866 F.3d 274, 279 (5th Cir. 2017). Because the standard is essentially the same for both pretrial detainees and postconviction prisoners, cases applying the Eighth Amendment remain relevant to the Court's analysis.

To establish deliberate indifference regarding his medical care, Hurdsman must show "that a prison official 'refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs.'" *Easter v. Powell*, 467 F.3d 459, 464 (5th Cir. 2006) (quoting *Domino v. Tex. Dep't of Criminal Justice,* 239 F.3d 752, 756 (5th Cir. 2001)). Allegations of unsuccessful medical treatment, mere negligence, neglect, or medical malpractice do not give rise to a § 1983 action. *See Varnado v. Lynaugh*, 920 F.2d 320, 321 (5th Cir. 1991) (per curiam).

Pretrial detention deliberate-indifference claims are analyzed based on whether they concern a "condition of confinement" or an "episodic act of omission." *Olabisiomotosho v. City of Houston*, 185 F.3d 521, 526 (5th Cir. 1999). To succeed on an "episodic act or omission" claim,

Hurdsman must show that Defendants acted with subjective deliberate indifference to his constitutional rights, meaning "the official had subjective knowledge of a substantial risk of serious harm to a pretrial detainee but responded with deliberate indifference to that risk." *Id.* (quotation omitted). "Actions and decisions by officials that are merely inept, erroneous, ineffective, or negligent do not amount to deliberate indifference." *Alderson v. Concordia Parish Corr. Facility*, 848 F.3d 415, 420 (5th Cir. 2017) (citations omitted).

Hurdsman claims two separate incidents of deliberate indifference: (1) he claims he was denied emergency medical care during and after the September 21 incident; and (2) he claims Defendants were deliberately indifferent to the skin sores and pain he was experiencing while he went without a mattress for thirty days.

As to the first claim, Defendants are entitled to summary judgment. The record shows that shortly after Hursdman was tased, he complained of shoulder pain and Defendant Brumleve called for Defendant Barnett, who then examined Hurdsman's shoulder and concluded there were no irregularities or deformities. Barnett also ensured that the straps on Hurdsman's ERC were not too tight, and Defendants Barnett and Nira checked on Hurdsman approximately every fifteen minutes while he was in the ERC. Further, Hurdsman was offered but refused an x-ray of his shoulder the next day, saying he was no longer in pain. Accordingly, there is no evidence suggesting Defendants were deliberately indifferent to a significant risk of serious harm during the September 21 incident.

However, a factual dispute exists as to whether Defendants Pokluda, Gleason, Casey, Mobley, and Wheless were deliberately indifferent to a substantial risk of serious harm when they deprived Hurdsman of a mattress for 30 days. Defendants argue that Hurdsman's skin sores were not a serious medical condition and that he received adequate medical treatment for them. In support, they point to two videos showing Hurdsman refusing skin ointment: one, taken on

September 28, approximately 6 days before Hurdsman initially complains of his skin sores; and the second, taken on October 8 at 2:36 a.m.—two days after Hurdsman saw the doctor—shows Hurdsman asking that the zinc oxide be put in his property box. From this, Defendants infer that Hurdsman's erythemas were nothing more than a "superficial reddening of the skin" (ECF No. 76 (ex. A at 43)), and that, nonetheless, Hurdsman received prompt medical attention. Hurdsman attests that the sores he developed were painful, and occasionally cracked and bled.

The Fifth Circuit has held that "it is clearly established that delaying medical care can constitute [deliberate indifference] if the prion official 'knows that the inmate faces a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it,' and the delay results in substantial harm." *See Delaughter v. Woodall*, 909 F.3d 130, 140 (5th Cir. 2018). Further, although not directly on point, the Fifth Circuit has held that "[t]here is no question that allowing bedridden prisoners to develop bedsores may demonstrate deliberate indifference to the needs of those prisoners." *Green v. McKaskle*, 788 F.2d 1116, 1126 (5th Cir. 1986).

Hurdsman alleges that all Defendants are liable for his deliberate indifference claim regarding his skin sores. However, he fails to make any factual allegations imputing the personal knowledge or involvement of Defendants Williams, Brumleve, Barcenas, Herrera, Villareal, Voisine, Barnett, Harris, Nira, or Davis. Accordingly, these Defendants are granted summary judgment on this claim. *See Thompson v. Steele*, 709 F.2d 381, 382 (5th Cir. 1983) ("Personal involvement is an essential element of a civil rights cause of action"); *see also Boudreaux v. Swift Transp. Co.*, 402 F.3d 536, 544 (5th Cir. 2005) (absence of evidence for non-movant's claim is proper basis for granting summary judgment).

As for the remaining Defendants, Hurdsman complained of pain and bleeding from the sores on his legs, and the doctor who saw him recommended he be given a soft surface, yet

Defendants refused to give him the mattress for another sixteen days. It is undisputed that Defendants were aware of the doctor's recommendation, and they do not dispute Hurdsman's allegation that they knew his sores were bleeding and painful. Yet there is no evidence in the record as to why Defendants waited sixteen days to comply with the doctor's recommendation. Based on the record before it, the Court concludes that Defendants exhibited the kind of "wanton disregard"[9] of a serious medical need that is forbidden by the Eighth and Fourteenth Amendments. *See Farmer*, 511 U.S. at 834 (deliberate indifference requires actual knowledge and conscious disregard of the risk of harm to the prisoner); *cf. Lawson v. Dallas Cnty*, 286 F.3d 257, 262-63 (5th Cir. 2002) (affirming district court's denial of qualified immunity when record supported defendants had actual knowledge of the seriousness of plaintiff's bedsores, but failed to follow doctors' specific instructions for treatment of the sores). Accordingly, summary judgment is denied as to Defendants Pokluda, Gleason, Casey, Mobley, and Wheless; this claim will proceed to trial.

### 4. First Amendment—Religious Freedom

It is well-established that inmates retain their First Amendment rights to the free exercise of religion, "subject to reasonable restrictions and limitations necessitated by penological goals." *Hicks v. Garner*, 69 F.3d 22, 25 (5th Cir. 1995). The inmate must show that a prison policy, as applied, was "not reasonably related to legitimate penological objectives." *DeMarco*, 914 F.3d at 388. In evaluating the reasonableness of a prison policy, courts look to four factors: (1) whether there is a rational relationship between the prison regulation and the governmental interest put forward to justify it; (2) whether the plaintiff has alternate means of exercising the right; (3) the impact an accommodation would have on guards and other prisons; and (4) whether ready

---

[9] *Johnson v. Treen*, 759 F.2d 1236, 1238 (5th Cir. 1985) ("Wanton means reckless—without regard to the rights of others…. Wantonly means causelessly, without restraint, and in reckless disregard of the rights of others.")

alternatives could fully accommodate the plaintiff's rights at a *de minimis* cost. *See Mayfield v. Texas Dept. of Criminal Justice*, 529 F.3d 599, 607 (5th Cir. 2008) (citing *Turner v. Safley*, 482 U.S. 78, 89-91 (1987)). Substantial deference is given to prison officials in the exercise of their professional judgment; however, to be entitled to summary judgment, the record must be "sufficient to demonstrate that the [p]olicy is a reasonable one." *Prison Legal News v. Livingston*, 683 F.3d 201, 215 (5th Cir. 2012) (citations and quotations omitted).

Defendants argue that they are entitled to summary judgment because Hurdsman's Bible and rosary were available to him during his dayroom time; that, even without his Bible, Hurdsman attested he had memorized the Our Father and Hail Mary and so could still pray without his religious items;[10] and finally, that a temporary property restriction for disciplinary purposes is a legitimate penological objective. Hurdsman, however, denies having his Bible and rosary during dayroom hours. Defendants point to a video taken on September 22 where a guard tells Hurdsman that his Bible is in his plastic tub (the Bible is not seen on camera) and the October 10 photographs of Hurdsman's bin (which Hurdsman claims are "staged" (ECF No. 81 at 17 n.111)).

Missing from this evidence, however, is any affidavit or attestation from any Defendant regarding the legitimate penological interest served in confiscating Hurdsman's religious property. The Court finds it notable that Defendants permitted Hurdsman to retain his legal paperwork and dictionary in his cell but confiscated his Bible and rosary. In their summary judgment motion, Defendants argue that this confiscation was merely a temporary property restriction for disciplinary purposes, which is a legitimate penological interest. They then cite to cases purporting to support this proposition, but which the Court finds are inapposite.[11]

---

[10] Hurdsman's Dep. 212:12-21.
[11] In *Rubio v. Diaz*, No. 08-cv-0942, 2010 WL 183879 (W.D. Tex. Jan. 15, 2010), the plaintiff's First Amendment complaint was dismissed because he wanted his Bible returned not for purposes of practicing his religion, but because it contained the names and addresses of his family members. In *Hanson v. Richardson*, No. 06-cv-178, 2008 WL

No Defendant has attested to the Court that the purpose of removing Hurdsman's religious materials from his cell was to discipline him for the September 21 incident. Further, the sanctions imposed after his October 21 disciplinary hearing included loss of telephone, commissary, and visitation privileges, but did not countenance loss of religious property. Thus, the Court concludes that Defendants' argument comes to this: the legitimate penological interest in confiscating Hurdsman's religious property can be inferred by the fact that Defendants chose to discipline him this way. But this is much too broad: Defendants could justify any restriction to an inmate's constitutional rights based on this reasoning.

The question remains: what was the legitimate penological interest served by allowing Hurdsman to retain his legal documents but confiscating his religious property? *See Turner*, 482 U.S. at 89-90 ("there must be a 'valid, rational connection' between the prison regulation and the legitimate governmental interest put forward to justify it. . . a regulation cannot be sustained where the logical connection between the regulation and the asserted goal is so remote as to render the policy arbitrary or irrational) (citation omitted). There might well be a legitimate penological interest in confiscating Hurdsmans's Bible and rosary for thirty days; however, such a policy is not before the Court at this juncture. Accordingly, summary judgment is denied as to Defendants Pokluda, Gleason, Casey, and Mobley; this claim will proceed to trial.

---

818893 (N.D. Tex. Mar. 27, 2008), the plaintiff's Bible was confiscated for six or seven weeks because prison officials believed plaintiff used it to plug up the air conditioning vent, and as such, the restriction was rationally related to the legitimate governmental interest in security and the proper maintenance of the jail. In *Newby v. Pate*, No 06-cv-127, 2007 WL 2791455 (N.D. Tex. Sept. 4, 2007), the plaintiff had some religious material confiscated for fifty-four days; however, he was allowed to retain any single religious publication of his choice.

*5. First Amendment—Right to Correspond*

It is well-recognized inmates have a First Amendment right both to send and receive mail. *See Thornburgh v. Abbott*, 490 U.S. 401, 407 (1989). Like an inmate's right to the free exercise of religion, however, prison officials can justify restrictions to this right by showing that the restriction is reasonably related to a legitimate penological objective. *See Prison Legal News*, 683 F.3d at 214. The analysis of the reasonableness is the same as the analysis for a free exercise claim, i.e. "rationality is the controlling factor" and the "remaining factors are best understood as indicators of rationality." *See id.* at 214-15 (quoting *Mayfield,* 529 F.3d at 607).

Hurdsman alleges that Defendants deprived him of all his writing instruments, paper, envelopes, and postage for thirty days. Defendants allege that Hurdsman could access his correspondence materials during his dayroom time. In the September 22 video, the officer transporting Hurdsman back to his room tells him "all your correspondence, writing utensils . . . you can have during dayroom time." Hurdsman's WCJ contact sheet for September 21 to October 21 shows that he mailed out three legal packages and five inter-jail letters to his wife. Further, while Hurdsman's official sanctions for the September 21 incident included loss of telephone, television, visitation, and commissary privileges, they do not include loss of correspondence privileges. WCSO's policies state that an inmate will not be deprived of correspondence privileges "when the offence is unrelated to a violation of the institutional rules and regulations regarding correspondence" and Defendants do not argue that Hurdsman's offence, Threatening, was related to the institutional rules and regulations regarding correspondence.[12]

In their motion, Defendants consistently argue that the correspondence restriction—like the confiscation of Hurdsman's religious materials—was merely a "temporary property

---

[12] To be clear, a prison official's failure to follow prison rules or policies does not, in and of itself, set forth a constitutional claim. *McFaul v. Valenzuela*, 684 F.3d 564, 579 (5th Cir. 2012)

restriction" aimed at the legitimate penological objective of discipline. Again, however, no Defendant has attested that this was the objective WCSO was achieving by restricting Hurdsman's constitutional rights; rather, Defendants apparently believe that the legitimacy of the restrictions can be inferred by the fact that Hurdsman was disciplined with them. Even with pleading a qualified immunity defense, Defendants must do more than sit on their hands: they must show that there was a legitimate penological objective in confiscating Hurdsman's correspondence materials. Yet there is no evidence in the record of any penological objective. *See Prison Legal News*, 683 F.3d at 215 (to be entitled to summary judgment, record must be "sufficient to demonstrate that the [p]olicy is a reasonable one") (quoting *Beard v. Banks*, 548 U.S. 521, 533 (2006)). Accordingly, summary judgment is denied as to Defendants Pokluda, Gleason, Casey, and Mobley; this claim will proceed to trial.

### 6. Corporal Punishment

Under the Fourteenth Amendment, the State has a duty to provide pretrial detainees with basic human needs, including medical care and protection from harm, and cannot punish them. *See Hare*, 74 F.3d at 639, 650 (citing *Bell v. Wolfish*, 441 U.S. 520 (1979)). Hurdsman claims that Defendants punished him by (1) putting him in the ERC and (2) depriving him of a mattress for thirty days. As noted above, Hurdsman's allegations are aimed at an "episodic act or omission" from his WCJ jailers; accordingly, to prove an underlying constitutional violation in an episodic act or omission case, a pretrial detainee must establish that an "official acted or failed to act with deliberate indifference to the detainee's needs." *Id.* at 647-48. In effect, then, the analysis of Hurdsman's right to be free from punishment is the same as the analysis of his right to medical care.

Regarding the ERC, there is no evidence that the defendants were deliberately indifferent to Hurdsman. The record shows that Hurdsman acted in defiance of Defendants' orders and was generally unruly. Further, Defendants checked on him every fifteen minutes, released him after he was subdued, and Hurdsman refused medical treatment afterward. Accordingly, Defendants are entitled to summary judgment on this claim.

However, there is a genuine issue of material fact whether Defendants deprived Hurdsman of his mattress in an effort to punish him. WCSO policy states that only inmates who destroy clothing or bedding may be deprived of such items for up to twenty-four hours, and that this deprivation should be reviewed and documented every twenty-four hours. Unlike when Defendants checked on Hurdsman while he was in the ERC, there is no such evidence of Defendants documenting the need for Hurdsman to be deprived of his mattress. Hurdsman complained that the lack of a mattress was causing him pain, and the physician who looked at his sores recommended giving him a "soft surface" to sleep on. But Defendants did not return the mattress until October 21, a full thirty days after they removed it from his cell.

A handful of Fifth Circuit cases suggest that a short-term mattress deprivation is not unconstitutional. *See Novak v. Beto*, 453 F.2d 661 (5th Cir. 1971) (no constitutional violation when inmates in solitary confinement were given gowns and blankets, but not mattresses, for up to fifteen days); *Phillips v. East*, 81 F. App'x 483, 485 (5th Cir. 2003) (denial of mattress for 2.5 days does not violate the Eighth Amendment); *Young v. McCain*, 760 F. App'x 251 (5th Cir. 2019) (denial of mattress between hours of 5:30 a.m. and 8:30 p.m. does not violate Eighth Amendment).

These cases say nothing about a mattress deprivation for thirty days. As noted above, it is clearly established that a pretrial detainee has the constitutional right to be free from punishment. *See Bell*, 441 U.S. at 534-37. As a result, because there is no evidence in the record as to why

Defendants deprived Hurdsman of a mattress for 30 days, and because the Court has already concluded that there is a genuine issue of material fact as to whether Defendants were deliberately indifferent to Hurdsman's medical needs, summary judgment is denied as to Defendants Pokluda, Gleason, Casey, Mobley, and Wheless; this claim will also proceed to trial.

### 7. Municipal Liability

A municipality may be liable under § 1983 for the violation of constitutional rights. *See Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1978). When attributing violations of pretrial detainees' constitutional rights to municipalities, the cause of those violations is characterized either as a condition of confinement or as an episodic act or omission. *Hare*, 74 F.3d at 644. Cases of the former are attacks on "general conditions, practices, rules, or restrictions of pretrial confinement." *Id.* In cases of the latter, "the complained-of harm is a particular act or omission of one or more officials," and "an actor usually is interposed between the detainee and the municipality." *Scott v. Moore*, 114 F.3d 51, 53 (5th Cir. 1997) (*en banc*).

Hurdsman presents an episodic-act theory against Williamson County. To establish municipal liability in an episodic-act case, a plaintiff must show "(1) that the municipal employee violated the pretrial detainee's clearly established constitutional rights with subjective deliberate indifference; and (2) that this violation resulted from a municipal policy or custom adopted and maintained with objective deliberate indifference." *Brumfield v. Hollins*, 551 F.3d 322, 331 (5th Cir. 2008) (quoting *Olabisiomotosho*, 185 F.3d at 528-29).

An official cannot be found liable "unless the official knows of and disregards an excessive risk to inmate safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*

*v. Brennan*, 511 U.S. 825, 837 (1994)). Acting or failing to act with deliberate indifference to a substantial risk of serious harm to a prisoner is the equivalent of recklessly disregarding that risk. *Id.* at 836.

Policy can take the form of written policy statements, ordinances, or regulations, but may also "arise in the form of a widespread practice that is 'so common and well-settled as to constitute a custom that fairly represents municipal policy.'" *James v. Harris Cnty.,* 577 F.3d 612, 617 (5th Cir. 2009) (quoting *Piotrowski v. City of Houston*, 237 F.3d 567, 579 (5th Cir. 2001)). It can also take the form of a failure to train, provided that the failure is "closely related to the ultimate injury" and not just attributable to a particular officer's shortcomings. *City of Canton v. Harris*, 489 U.S. 378, 388-91 (1989). It can also be a decision to adopt a course of action to handle a particular situation, if made by an authorized decisionmaker. *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480-81 (1986).

Hurdsman claims that Williamson County is liable for his constitutional violations based on a sign Defendant Pokluda put on his door, [13] and also based on a failure to train. There is no evidence in the record supporting either an official policy or a common and well-settled custom on the part of Williamson County to retaliate against inmates for filing grievances or to sanction pretrial detainees with loss of all property, including a mattress. Further, while there is a triable question as to whether the sanctions Defendant Pokluda implemented against Hurdsman were constitutional, Captain Pokluda was not an authorized decisionmaker for purposes of municipal liability. *See Robinson v. Hunt Cnty.*, 921 F.3d 440, 448 (5th Cir. 2019) ("In Texas, the county

_____

[13] The sign in question was on Hurdsman's door for the duration of his 30-day sanctions, and it read:
"NOTHING IN CELL EXCEPT
**Suicide Smock, Blanket, Legal Paperwork, and Bar of Soap**
*Allowed to have writing utensils **ONLY** when in **DAYROOM**
Per Captain Pokluda"
(ECF No. 81 (ex. 34).)

sheriff is the county's final policymaker in the area of law enforcement . . . by virtue of the office to which the sheriff has been elected (citing *Turner v. Upton Cnty.*, 915 F.2d 133, 136 (5th Cir. 1990)).

Further, the record does not support a failure-to-train theory of municipal liability, which requires showing a facially valid policy and a failure to train employees such that the failure "constitutes 'official policy' that can support municipal liability if it 'amounts to deliberate indifference.'" *Garza*, 922 F.3d at 637 (quoting *Littell v. Houston Indep. Sch. Dist.*, 894 F.3d 616, 624 (5th Cir. 2018)). Deliberate indifference can be shown from a pattern of constitutional violations or from "showing a single incident with proof of the possibility of recurring situations that present an obvious potential for violation of constitutional rights." *Id.* However, the latter showing has been inferred only in "narrow and extreme circumstances." *Id.* The record before the Court does not support this inference as there is no evidence of what training Defendants did or did not receive. Accordingly, Defendant Williamson County is entitled to summary judgment on all claims.

D. Motion to Strike Plaintiff's Experts

Pending before the Court is Defendants' Motion to Strike Plaintiff's Experts. (ECF No. 78.) On April 16, 2018, Hurdsman sent Defendants a letter designating four expert witnesses: two police trainers, and two professors. (*Id.* (ex. A).) Defendants responded by asking Hurdsman to send them the report required under Fed. R. Civ. P. 26(a)(2). (*Id.* (ex. B).) Hurdsman never sent Defendants any reports; further, in his deposition, Hurdsman stated that these experts were "quite expensive" and that he would not "be able to afford them, obviously." He further attested that the

experts he designated had not agreed to provide any testimony and that he did not see them doing so in the future. (*Id.* (ex. C).) Hurdsman has not responded to Defendant's motion.

District courts have "wide latitude" in pretrial matters, *Campbell v. Keystone Aerial Surveys, Inc.*, 183 F.3d 996, 1000 (5th Cir. 1998), and a trial court's ruling on the admissibility of expert evidence in the summary judgment context "must be sustained unless manifestly erroneous," *Boyd v. State Farm Ins. Co.*, 158 F.3d 326, 331 (5th Cir. 1998). Hurdsman has failed to supply the reports required under Fed. R. Civ. P. 26(a)(2) and attested that he does not anticipate calling any expert witnesses. Accordingly, Defendants' Motion to Strike is granted.

### E. Plaintiff's Fed. R. Civ. P. 56(d) Motion

Several weeks after Hurdsman had filed his opposition to Defendants' Motion for Summary Judgment, he filed a motion Pursuant to Fed. R. Civ. P. 56(d). (ECF No. 86.) Hurdsman argues that Defendants are withholding several videos: (1) two videos that show Hurdsman complaining to several WCSO and WCJ employees—including Defendant Mobley—about the bleeding sores on his legs and the confiscation of his religious property and correspondence materials; (2) a video showing certain WCSO officers returning Hurdsman's mattress, religious property, and correspondence materials on October 21; and (3) a video from the September 21 incident showing him being removed from the ERC, and then left on a concrete floor for several hours with a back injury and no medical attention. (*Id.* (ex. A).) Hurdsman also argues that Defendants have failed to produce several discovery items: (1) all the identifying information for inmates housed in the same WCJ jail area as Hurdsman from September 20 to October 21, 2016; (2) the "reports, logs, lists, documentation or accounts" of all WCJ inmates either placed in an ERC or tasered from April 2015 to July 2017; and (3) the identifying information for certain

WCSO officers who Hurdsman claims are eyewitnesses. (*Id.* (ex. A).) Hurdsman argues that, without the above information, he cannot present crucial facts to support his opposition to Defendants' summary judgment motion.

To prevail on a motion for additional discovery pursuant to Rule 56(d), the party filing the motion must show how additional discovery will create a genuine issue of material fact. Specifically, "the non-moving party must set forth a plausible basis for believing that specified facts, susceptible of collection within a reasonable time frame, probably exist and indicate how the emergent facts, if adduced, will influence the outcome of the pending summary judgment motion." *Smith v. Reg'l Transit Auth.*, 827 F.3d 412, 422-23 (5th Cir. 2016) (internal quotations and citations omitted). In general, Rule 56(d) motions "are broadly favored and should be liberally granted." *Id.* (citation omitted).

Regarding the additional videos Hurdsman is requesting, he has already survived summary judgment on those claims, and thus the videos are not necessary to create a genuine issue of material fact. The same goes with the "information" he requests on the inmates that were housed near his cell from September 20 to October 21 and the WCSO eye witness: he has survived summary judgment on most of his claims, and to the extent he has not (e.g. the deliberate indifference claim based on a lack of emergency medical care), the names of these individuals would not help in creating a genuine issue of material fact.

Finally, Hurdsman's request for data related to how frequently WCJ uses the ERC or tasers is too broad. The Court assumes Hurdsman wants this data in order to establish a basis for municipal liability. However, neither placement in an ERC or tasing are per se unconstitutional, and thus Hurdsman would need more than just this data in order to create a genuine issue of material fact on municipal liability. Accordingly, this motion is denied.

<u>CONCLUSION</u>

It is therefore **ORDERED** that Defendants' Motion for Summary Judgment (ECF No. 77) is **GRANTED IN PART AND DENIED IN PART** as follows:

<u>Claim 1. Retaliation:</u> Summary judgment is **GRANTED** as to Defendants Barnett, Harris, Nira, Davis and Williamson County. Summary judgment is **DENIED** and this claim will proceed to trial against Defendants Pokluda, Gleason, Williams, Brumleve, Casey, Mobley, Barcenas, Herrera, Villareal, Voisine, and Wheless.

<u>Claim 2. Excessive Force</u>: Summary judgment is **GRANTED** as to Defendants Barcenas, Villareal, Davis and Williamson County. Summary judgment is **DENIED** and this claim will proceed to trial against Defendants Brumleve and Herrera.

<u>Claim 3. Deliberate Indifference (emergency medical care)</u>: Summary judgment is **GRANTED** to all Defendants. This claim is dismissed.

<u>Claim 4. Deliberate indifference (skin sores)</u>: Summary judgment is **GRANTED** as to Defendants Williams, Brumleve, Barcenas, Herrera, Villareal, Voisine, Barnett, Harris, Nira, Davis, and Williamson County. Summary judgment is **DENIED** and this claim will proceed to trial against Defendants Pokluda, Gleason, Casey, Mobley, and Wheless.

<u>Claim 5. First Amendment-Religious Freedom</u>: Summary judgment is **GRANTED** as to Defendant Williamson County. Summary Judgment is **DENIED** and this claim will proceed to trial against Defendants Pokluda, Gleason, Casey, and Mobley.

<u>Claim 6. First Amendment-Right to Correspond</u>: Summary judgment is **GRANTED** as to Defendant Williamson County. Summary judgment is **DENIED** and this claim will proceed to trial against Defendants Pokluda, Gleason, Casey, and Mobley.

Claim 7. Corporal Punishment (ERC): Summary judgment is **GRANTED** as to all Defendants. This claim is dismissed.

Claim 8. Corporal Punishment (mattress): Summary judgment is **GRANTED** to Williamson County. Summary Judgment is **DENIED** and this claim will proceed to trial against Defendants Pokluda, Gleason, Casey, and Mobley.

It is **ORDERED** that all of Plaintiff's claims against Defendants Barnett, Harris, Nira, Davis, and Williamson County are **DISMISSED WITH PREJUDICE** and these Defendants are dismissed from this case.

It is further **ORDERED** that Defendants' Motion to Strike Plaintiff's Experts (ECF No. 78) is **GRANTED** and Plaintiff's Fed. R. Civ. P 56(d) Motion (ECF No. 86) is **DENIED**.


**SIGNED** on January 13, 2020.

ROBERT PITMAN
UNITED STATES DISTRICT JUDGE